# United States Tax Court

T.C. Memo. 2024-112

KEVIN JOHN WITASICK, SR. AND WHITNEY S. WITASICK,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 23069-16.                    Filed December 19, 2024.

————

*John A. Calzaretto*, for petitioners.

*Brian S. Jones*, *David A. Indek*, and *Amanda K. Krugler*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  Petitioner husband is an attorney who initially practiced law in Arizona.  In October 1998 he and his wife purchased a historic home called Stoneleigh Manor (Stoneleigh) in Stanleytown, Virginia.  They intended to use this mansion as their residence and as a satellite office for petitioner husband's law practice.

During 1999 and 2000 petitioners embarked on a complete rehabilitation of Stoneleigh that cost more than $1 million.  On their 1999 and 2000 Federal income tax returns they reported almost half of the renovation costs as expenses of petitioner husband's law practice, supposedly incurred for business use of the home.  But they disguised the true nature of these expenses by reporting them as deductions for "outside services" (in 1999) and as "unreimbursed expenses" incurred on behalf of his law partnership (in 2000).

Petitioners were indicted for tax evasion and subscribing false tax returns (among other charges) in the U.S. District Court for the Western District of Virginia.  Mr. Witasick was convicted on the criminal tax

[*2] counts and sentenced to 15 months' imprisonment. His wife was acquitted on all charges.

The Internal Revenue Service (IRS or respondent) subsequently completed a civil examination of petitioners' 1999 and 2000 returns. In the light of the Stipulations and Amended Pleadings, respondent contends that petitioners are liable for deficiencies of $15,826 and $87,483 for 1999 and 2000, respectively, and that petitioner husband is liable for civil fraud penalties of $11,870 and $65,613, respectively, under section 6663.[1] We will sustain the deficiency and fraud determinations, with the precise amounts to be calculated under Rule 155.

## FINDINGS OF FACT

The following facts are based on the parties' Pleadings and Motion papers, the Joint Stipulation of Facts with attached Exhibits, and the testimony admitted into evidence at trial. Petitioners Kevin and Whitney Witasick, husband and wife, filed joint returns for 1999 and 2000. They resided in Ocean City, New Jersey, when they timely petitioned this Court.

I. *Stoneleigh*

Stoneleigh, the former home of a Virginia governor, is listed on the National Register of Historic Places. The estate sits on 56 acres and includes the house, an adjacent cottage, expansive lawns, gardens, and forest. During 1999 and 2000 the residence included two floors of living space, a basement, and an unfinished attic, with a total of 40 rooms.

The first floor included a grand hall entrance, great living room, dining room, breakfast room, gallery, sunroom, library, kitchen, butler's pantry, and mudroom. The second floor included an office, a sitting room, and 9 bedrooms (including 5 suites with adjoining bathrooms). The basement included a trophy room, billiard room, game room, boiler room, dry room, laundry room, wood room, and coal room. The names attached to these rooms reflect their original historical use as of the time petitioners purchased the home.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3]    According to tax assessment records, the home's living area during 1999 and 2000 was 11,314 square feet, not including 4,319 square feet for the basement.  Including the basement and excluding the attic, therefore, the overall square footage was 15,633.  The footprint for the first and second floors was roughly the same, the basement being slightly smaller.  The first-floor library, ultimately used as Mr. Witasick's office, measured 321 square feet.

Petitioners purchased Stoneleigh for $800,000 in October 1998, when it was in a general state of disrepair.  During 1999 and 2000 they spent $1,010,134 renovating it.  All renovation costs were reflected in a check disbursement log.  Nancy Booth, who worked for a vendor performing work at Stoneleigh, had signature authority on the checking account and oversaw many of the construction projects.  Petitioners produced no evidence at trial regarding specific details of the rehabilitation work.  But petitioner husband insisted that every dollar they spent involved a repair rather than a capital improvement.

During 1999 petitioners spent $451,949 on renovations to Stoneleigh.  Of that sum, $328,415 was paid for "material, equipment, and labor."  These expenditures included $24,786 paid to Burr Fox Specialty Woodwork to replace cabinetry and woodwork in the kitchen, bedrooms, in-law suite, and library; $22,878 paid to Elite Heating and Cooling for heating and air conditioning equipment and services; $60,232 paid to Inside Outlet for the installation of flooring, carpeting, and tiling; and $35,264 paid to Roy's Electric Service for electrical work.  Respondent contends that these four outlays constituted nondeductible capital expenditures.

During 2000 petitioners spent $558,185 on renovations to Stoneleigh.  Of that sum, $276,488 was paid for "material, equipment, and labor."  These expenditures included $66,793 paid to Nichols Construction Co. for waterproofing, resurfacing walls, carpeting, and other work done on the basement level.  Respondent contends that this outlay constituted a nondeductible capital expenditure.

II.    *Petitioner Husband's Law Firm Operations*

During 1999 and 2000 petitioner husband was admitted to practice in Arizona and Virginia.  In 1999 he did business through the Law Offices of Kevin John Witasick; in 2000 he did business through a partnership, Witasick & Parker.  His wife was listed on the couple's 1999 and 2000 tax returns as the "director of office" for the law practice.

**[\*4]**    Mr. Witasick originally had his primary law office in Arizona.  But he opened a satellite office at Stoneleigh in April 1999, when petitioners moved into the home.  While in Virginia he worked from the library on the first floor.  In June 1999 his brother-in-law, Paul Scott, joined the firm as a paralegal and worked from the basement's game room and (later) the billiard room.  Although the firm had very few clients in Virginia, the game room was occasionally used for client conferences.  Mrs. Witasick discharged various tasks in a home office on the second floor.  They were the only people who allegedly performed services for the law firm at Stoneleigh during 1999.[2]

During 2000 Mr. Witasick continued to practice law in Arizona and Virginia, but in partnership with John Parker.  From January through March 2000 only Mr. Witasick and paralegal Paul Scott worked from Stoneleigh.  Mr. Witasick continued working in the first-floor library and Mr. Scott in the basement.  Kimberly Belognia, an attorney, and Susan Caviness, a secretary, joined the firm in April 2000 and worked from the basement at Stoneleigh.

During the summer of 2000 renovations to the basement caused all employees (except petitioner husband) to vacate Stoneleigh and work from an office in nearby Martinsville, Virginia.  In September the staff resumed work in the basement.  Two new attorneys, Maria Stewart and Samuel Weaver, joined the firm in November and likewise worked in the basement.

Most of the legal work performed at Stoneleigh concerned clients in Arizona, not Virginia.  Ms. Belognia corresponded frequently with the Arizona office but rarely (if ever) met with clients at Stoneleigh.  Petitioner husband testified that client files were regularly shipped to Stoneleigh from the Arizona office and were stored in the basement.  In 2001 Mr. Witasick relocated the satellite office to Martinsville, and all staff employees ceased working out of Stoneleigh.

III.    *Petitioners' Tax Reporting*

Petitioners filed their 1999 Federal income tax return on October 16, 2000.  On Schedule C, Profit or Loss From Business, they claimed a

---

[2] Mrs. Witasick did not attend the trial, and respondent was thus unable to question her about what work she did for the law firm and whether her home office was used exclusively for business purposes.  To resolve this problem, the parties stipulated at trial that Mrs. Witasick's home office on the second floor of Stoneleigh is to be excluded in calculating the business use of the home.

**[\*5]** deduction of $179,748 for "outside expenses." In fact, the expenses underlying this deduction consisted of a portion of the 1999 renovation costs for Stoneleigh, corresponding to the percentage of the building allegedly used for the satellite law office. Petitioners did not include in their return Form 8829, Expenses for Business Use of Your Home.

Petitioners filed their 2000 Federal income tax return on October 16, 2001. They included with this return Schedule E, Supplemental Income and Loss, to report Mr. Witasick's income from the law firm partnership. On Schedule E they claimed a deduction of $290,744 for "unreimbursed expenses" allegedly incurred by Mr. Witasick on behalf of the partnership. In fact the expenses underlying this deduction consisted of a portion of the 2000 renovation costs for Stoneleigh, corresponding to the percentage of the building allegedly used for the satellite law office. Petitioners again failed to include Form 8829 with their return.

IV.    *Criminal Proceedings*

In October 2007 petitioners were indicted in the U.S. District Court for the Western District of Virginia on several criminal charges, including the filing of false and fraudulent Federal income tax returns for 1999 and 2000. The indictment alleged that petitioners had substantially overstated the business expenses of Mr. Witasick's law practice, had disguised remodeling and renovation expenses as business-related costs, and had engaged in other conduct the likely effect of which was to mislead and conceal, all in violation of section 7201.

In May 2010 petitioner husband was convicted of tax evasion (among other charges) for both years and sentenced to 15 months' imprisonment. He appealed his conviction to the U.S. Court of Appeals for the Fourth Circuit, which affirmed his conviction, and the Supreme Court denied his petition for certiorari. *See United States v. Witasick*, 443 F. App'x 838 (4th Cir. 2011), *cert. denied*, 565 U.S. 1250 (2012). Petitioner wife was acquitted on all charges.

V.    *IRS Civil Examination*

Following conclusion of the criminal proceedings, the IRS initiated a civil examination of petitioners' 1999 and 2000 returns. The examination was assigned to revenue agent (RA) Patricia Taylor, whose immediate supervisor at all relevant times was Joseph Stopyra. RA Taylor prepared an examination report setting forth her proposed adjustments and penalty recommendations. For both petitioners she recommended a 75% civil fraud penalty under section 6663.

**[\*6]**     On February 23, 2016, the IRS sent petitioners a Letter 950 (commonly called a "30-day letter"). The letter was signed by Mr. Stopyra, RA Taylor's immediate supervisor. He attached to that letter Forms 886A, Explanation of Items, and 5278, Statement—Income Tax Changes. This packet of documents constituted the first formal communication to petitioners that the IRS intended to assert civil fraud penalties.

On July 26, 2016, the IRS issued petitioners a Notice of Deficiency for both years. For 1999 the Notice recharacterized the $179,748 of "outside expenses" reported on Schedule C as "expenses for business use of the home." It disallowed $50,596 of that sum and determined that a home office deduction of $129,152 was allowable. On the basis of this and several other adjustments not at issue here, the Notice determined for 1999 a deficiency of $15,826 and a fraud penalty of $11,870 under section 6663.

For 2000 the Notice recharacterized the "unreimbursed expenses" reported on Schedule E as "home office expense" and determined that a home office deduction of $170,139 was allowable. In calculating the resulting deficiency, the Notice assumed incorrectly that the "unreimbursed expenses" reported on Schedule E were $242,391, whereas in fact they were $290,744. The Notice thus determined an adjustment of $72,252 (i.e., $242,391 minus $170,139), instead of $120,605 (i.e., $290,744 minus $170,139). On the basis of this and several other adjustments not at issue here, the Notice determined for 2000 a deficiency of $32,790 and a fraud penalty of $24,593.

In making the downward adjustments to the allowable home office deductions, the IRS proceeded in four steps. First, it determined that some of the costs were personal, unrelated to Mr. Witasick's law practice, and were thus nondeductible. Second, it determined that some of the renovation costs had to be capitalized rather than deducted, and it allowed a modest depreciation deduction on the capitalized costs. Third, it determined that some of the costs were 100% allocable to Mr. Witasick's law practice and deductible in full. Finally, it determined that 25% of Stoneleigh was used for Mr. Witasick's law practice in 1999 and 2000—the "business use" percentage—so that 25% of the remaining renovation costs could be deducted as home office expense each year.

[*7] VI.    *Tax Court Trial*

This case involved extensive pretrial Motions practice. Several issues were decided by Orders the Court issued between 2020 and 2023. Other issues were resolved by stipulation of the parties. We address those matters briefly below.

A.    *Respondent's Motion to Amend Pleadings*

On February 26, 2020, respondent filed a Motion for Leave to File First Amendment to Answer to assert an increased deficiency and an increased fraud penalty for 2000. Respondent urged that this amendment was justified to correct two errors that occurred at the end of the IRS examination. First, as noted above, the Notice incorrectly assumed that the "as reported" home office deduction for 2000 was $242,391, whereas petitioners had claimed a deduction of $290,744. This error reduced the resulting adjustment to $72,252, whereas it should have been $120,605. *See supra* p. 6. Second, whereas petitioners had claimed a dollar-for-dollar deduction for their renovation costs on Schedule E, respondent contended that there existed no written partnership agreement entitling Mr. Witasick to claim Stoneleigh renovation costs as unreimbursed expenses of the partnership. In respondent's view, therefore, petitioners were required to report the home office deduction for 2000 as a miscellaneous itemized deduction on Schedule A, Itemized Deductions, subject to a 2% floor keyed to adjusted gross income (AGI). § 67(a). *See generally Knight v. Commissioner*, 552 U.S. 181, 184 (2008).

Correcting these two errors, respondent moved to amend his Answer to assert for 2000 a revised deficiency of $87,483 and a revised fraud penalty of $65,613. After requesting a response from petitioners, the Court granted respondent's Motion by Order served March 12, 2020. The Court concluded that the amendment had a reasonable basis, that it would inject no new factual issues into the case, and that any possible risk of prejudice to petitioners would be cured by the Court's granting their request for a continuance. The deficiency and fraud penalty in dispute for 2000 are thus $87,483 and $65,613, respectively.

B.    *Stipulation of Facts*

On January 15, 2021, the parties filed a First Stipulation of Facts in which they narrowed the scope of their dispute. First, they agreed that Mrs. Witasick is not liable for the civil fraud penalty for 1999 or 2000. Second, they agreed that the revenue agent had secured timely supervisory approval from her immediate supervisor to assert the fraud

[*8] penalty against Mr. Witasick. Third, they agreed upon the total amount of Stoneleigh renovation costs for each year and on the proper treatment (for home office deduction purposes) of roughly a third of those costs. For the costs remaining in dispute, the parties disagree on only two points: (1) whether any portion of the costs must be capitalized rather than deducted, and (2) whether the "business use of the home" percentage for calculating the home office deduction should be 25% or 40%.

For 1999 costs of $303,022 remain in dispute. Petitioners contend that none of these costs should be capitalized and that 40% of the costs (or $121,209) should be included in the home office deduction. Respondent contends that $142,880 of the costs must be capitalized, that depreciation of $1,983 should be allowed on the capitalized costs, and that 25% of the remaining costs—$160,142 × 0.25, or $40,036—should be included in the home office deduction.

For 2000 costs of $290,695 remain in dispute. Petitioners contend that none of these costs should be capitalized and that 40% of the costs (or $116,278) should be included in the home office deduction. Respondent contends that $66,793 of the 2000 costs must be capitalized, that depreciation of $3,967 should be allowed on the capitalized costs, and that 25% of the noncapitalized costs—$223,902 × 0.25, or $55,976—should be included in the home office deduction.

C.      *Respondent's Motion for Partial Summary Judgment*

On August 30, 2021, respondent filed a Motion for Partial Summary Judgment seeking a ruling on the collateral estoppel effects of Mr. Witasick's conviction for tax evasion under section 7201. After receiving a response from petitioners, we granted that Motion by Order served October 7, 2021.

First, we held that Mr. Witasick's conviction collaterally estops petitioners from disputing that their 1999 and 2000 returns were fraudulent. *See Klein v. Commissioner*, 880 F.2d 260, 262 (10th Cir. 1989), *aff'g* T.C. Memo. 1984-392; *DiLeo v. Commissioner*, 96 T.C. 858, 885 (1991) ("A taxpayer is collaterally estopped from denying civil tax fraud under section [6663] when convicted for criminal tax evasion under section 7201 for the same tax year."), *aff'd*, 959 F.2d 16 (2d Cir. 1992). The U.S. Court of Appeals for the Third Circuit, to which appeal of this case presumably lies, has squarely ruled that a taxpayer's conviction for tax evasion precludes him from denying the existence of fraudulent

**[\*9]** underpayments of tax. *See Anderson v. Commissioner*, 698 F.3d 160, 164 (3d Cir. 2012), *aff'g* T.C. Memo. 2009-44, 97 T.C.M. (CCH) 1179.

Second, we held that Mr. Witasick's conviction collaterally estops petitioners from denying the existence of underpayments of tax for 1999 and 2000. *See ibid*; *Klein v. Commissioner*, 880 F.2d at 262; *Wilson v. Commissioner*, T.C. Memo. 2002-234, 84 T.C.M. (CCH) 321, 324. An underpayment of tax is an element of the crime of tax evasion under section 7201. A conviction for tax evasion collaterally estops a taxpayer from relitigating matters litigated in the criminal tax case, including whether the taxpayer "underpaid his tax for each of the taxable years." *Anderson*, 97 T.C.M. (CCH) at 1191 (quoting *Christians v. Commissioner*, T.C. Memo. 2008-220, 96 T.C.M. (CCH) 184, 187). Petitioners of course are free to dispute *the magnitude* of the underpayment for each year, i.e., whether the deficiencies determined in the Notice are correct. We held a trial for that purpose.

D.    *Petitioners' Motion to Amend Pleadings*

In the First Stipulation of Facts filed January 15, 2021, the parties stipulated in paragraph 78 the "total expenses for Stoneleigh for the taxable year 2000." Among these expenses was interest. Petitioners stipulated that the total amount of interest expense attributable to Stoneleigh for 2000 was $66,106 and that this issue was "Agreed 100%."

On January 19, 2021—four days after executing this Stipulation—petitioners filed a Motion for Leave to File First Amendment to Petition (Motion). In the Motion they sought to increase the interest expense allocable to Stoneleigh for 2000 by $84,000, i.e., to a total of $150,106. Petitioners explained that they had initially believed the additional interest "to be related to New Hampshire rental property [they] owned." But they said they had recently become aware that the $84,000 "related to interest paid on a $700,000 loan that [they] obtained in order to fund the purchase of Stoneleigh."

Respondent objected to the Motion. He urged that there were numerous factual uncertainties surrounding the alleged $84,000 payment, that this issue had been extensively negotiated by the parties in reaching agreement on the First Stipulation of Facts, and that the parties had agreed that the total amount of interest allocable to Stoneleigh for 2000 was $66,106, as stated in the Stipulation. Petitioners did not dispute respondent's account of these negotiations, acknowledging that the

**[\*10]** parties "were unable to agree to include any stipulations regarding the $84,000 expense."

By Order served April 13, 2021, the Court denied petitioners' Motion. We noted our general reluctance "to grant relief from stipulations arrived at through bargaining or if they were negotiated extensively." *See Lovenguth v. Commissioner*, T.C. Memo. 2007-70, 93 T.C.M. (CCH) 1040, 1042 (first citing *Associated Beverages Co. v. P. Ballantine & Sons*, 287 F.2d 261, 263 (5th Cir. 1961); and then citing *Markin v. Commissioner*, T.C. Memo. 1989-665). Petitioners acknowledged that "the $84,000 of purported interest expense was discussed during these conversations but was ultimately . . . not agreed upon." Instead, the Witasicks stipulated that the total amount of 2000 expense was $66,106.

The First Stipulation of Facts involved concessions by both parties about how dozens of individual expense items for Stoneleigh would be treated, as well as other matters. The stipulations were "arrived at through bargaining" and "were negotiated extensively." *See ibid.* Petitioners executed the Stipulation fully cognizant that the purported $84,000 of interest expense was not included. We accordingly ruled that they could not circumvent "the 'conclusive admission' contained in paragraph 78." *See* Rule 91(e) ("A stipulation will be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation."). We adhere to our prior ruling that petitioners are bound by their stipulation.[3]

---

[3] On September 17, 2021, petitioners moved for reconsideration of the Court's April 13, 2021, Order. We denied that Motion by Order served October 14, 2021. A party must file a motion for reconsideration within 30 days after the service of a written opinion or order. *See* Rule 161; *Bedrosian v. Commissioner*, 144 T.C. 152, 155–56 (2015). Petitioners filed their Motion for Reconsideration more than four months late, and we found that "[t]he motion's untimeliness is sufficient reason to deny it." In any event, we reaffirmed our conclusion that "the Witasicks have repeatedly stated in various filings that they were aware of the $84,000 amount of interest expense, attempted to stipulate to this amount with respondent's counsel, and ultimately agreed to omit it in the First Stipulation of Facts." Petitioners urged that they were not seeking to contradict their Stipulation, noting that the Stipulation concerned "the total expenses of Stoneleigh" and asserting that the putative $84,000 was an expense of Mr. Witasick's law practice wholly unrelated to Stoneleigh. That assertion, which petitioners reiterate in their Posttrial Brief, contradicts the representation in their original Motion that the $84,000 "related to interest paid on a $700,000 loan that petitioners obtained in order to fund the purchase of Stoneleigh."

**[\*11]** E.  *Respondent's Motion in Limine*

On April 24, 2023, respondent filed a Motion in Limine seeking to exclude from evidence amended returns petitioners had prepared for 1999 and 2000, as well as testimony from one or more accountants who had worked on those returns. These amended returns, which were not accepted for filing by the IRS, purported to show that petitioners had no underpayments of tax for 1999 or 2000 on the theory that they were entitled to additional deductions for interest expense.

We granted respondent's Motion by Order served July 18, 2023. We had previously ruled that petitioners were collaterally estopped from disputing the existence of underpayments for 1999 and 2000. *See supra* p. 9. And we had previously ruled that petitioners were foreclosed from arguing for interest deductions above the amounts they had stipulated. *See supra* pp. 9–10 & note 3. In paragraphs 40 and 78 of the First Stipulation of Facts, they stipulated that the total amounts of interest attributable to Stoneleigh for 1999 and 2000 were $62,279 and $66,106, respectively. We accordingly granted respondent's Motion in Limine insofar as he sought to preclude petitioners from introducing at trial any documents or evidence to support the contentions that (1) petitioners are entitled to additional interest expense deductions for either year; (2) there exists no underpayment of tax or tax loss for either year; or (3) petitioners have an overpayment of tax (or are entitled to a refund) for either year.[4]

OPINION

I.  *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct. *Welch v. Helvering,* 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving entitlement to any deductions claimed and of substantiating their amounts. Rule 142(a); *Hradesky v.*

---

[4] In their Posttrial Brief petitioners persist in contending that we erred in excluding their 1999 and 2000 amended returns from evidence. Again we disagree. Petitioners sought to use these returns to support two contentions they were precluded from advancing at trial—that they had no underpayment for 1999 or 2000 and that they were entitled to interest deductions in excess of the amounts they had stipulated. In any event, amounts shown on tax returns (or amended returns) simply constitute a statement of the taxpayer's position, as opposed to evidentiary support for the taxpayer's position. *Wilkinson v. Commissioner,* 71 T.C. 633, 639 (1979); *Roberts v. Commissioner,* 62 T.C. 834, 837 (1974); *Seaboard Com. Corp. & Sub. Cos. v. Commissioner,* 28 T.C. 1034, 1051 (1957).

**[\*12]** *Commissioner*, 65 T.C. 87, 90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). The Commissioner bears the burden of proof regarding fraud, and he must prove fraud by "clear and convincing evidence." § 7454(a); Rule 142(b). The burden of proof also shifts to the Commissioner with respect to any "new matter" or "increase[] in deficiency." Rule 142(a). Respondent thus bears the burden of proof to the extent he seeks an increased deficiency for 2000, as asserted in his Amended Answer.

II.   *Period of Limitations*

Section 6501(a) generally requires the IRS to assess a tax within three years after the return was filed. The period of limitations is extended to six years where the taxpayer omits from gross income an amount "in excess of 25 percent of the amount of gross income stated in the return." § 6501(e)(1)(A)(i). The Notice was issued to petitioners on July 26, 2016, more than 15 years after the period of limitations began to run for 2000, the last year at issue.

However, section 6501(c)(1) provides that, where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is no period of limitations, and the tax "may be assessed . . . at any time." In the case of a joint return, fraud by either taxpayer suspends indefinitely the period of limitations for both taxpayers. *Vannaman v. Commissioner*, 54 T.C. 1011, 1018 (1970); *see Richardson v. Commissioner*, 509 F.3d 736, 745 (6th Cir. 2007) (holding that fraud by one spouse "lifts the statute of limitations" for both), *aff'g* T.C. Memo. 2006-69; *Ballard v. Commissioner*, 740 F.2d 659, 663 (8th Cir. 1984) (same), *aff'g in part, rev'g in part* T.C. Memo. 1982-466.

"[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663 . . . ." *Neely v. Commissioner*, 116 T.C. 79, 85 (2001). Whether the underpayments at issue were due to fraud thus determines both whether Mr. Witasick is liable for the civil fraud penalties and whether respondent can assess the deficiencies against both petitioners.

In granting respondent's Motion for Partial Summary Judgment, the Court determined that Mr. Witasick's conviction for tax evasion collaterally estops petitioners from disputing that their 1999 and 2000 returns were fraudulent. Petitioners note that Mrs. Witasick "was not convicted of anything" and urge that collateral estoppel should not apply

**[\*13]** to her with regard to the period of limitations. We disagree. What calls off the period of limitations is the filing of a fraudulent return, and the courts in the criminal case determined that the 1999 and 2000 returns were both fraudulent. For period-of-limitations purposes, it does not matter whether one or both spouses who signed a joint return were guilty of fraud. Respondent's concession that Mrs. Witasick is not liable for the fraud penalty is irrelevant in determining whether the limitations period remains open, because Mr. Witasick's tax evasion conviction indefinitely suspended the period of limitations for both petitioners. *See Richardson v. Commissioner*, 509 F.3d at 745.

III. *Calculation of Home Office Deduction*

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Taxpayers must show that they have met all requirements for each deduction and keep books or records that substantiate expenses underlying it. § 6001; *Roberts*, 62 T.C. at 836. Failure to keep and present such records counts heavily against a taxpayer's attempted proof. *Rogers v. Commissioner*, T.C. Memo. 2014-141, 108 T.C.M. (CCH) 39, 43.

A. *Capitalized Costs*

Respondent agrees that petitioners are entitled to deduct expenses properly allocable to the home office through which petitioner husband conducted his law practice. A threshold question, however, is whether some of the costs petitioners incurred to renovate Stoneleigh must be capitalized rather than expensed. During the examination the IRS determined that rehabilitation costs of $142,880 for 1999 and $66,793 for 2000 were capital in nature.

Incidental repairs to property are deductible under section 162(a) if they maintain the property in an ordinarily efficient operating condition and do not appreciably prolong its life or materially add to its value. Treas. Reg. § 1.162-4. By contrast, section 263(a)(1) generally prohibits deductions for capital expenditures, which include "[a]ny amount paid out . . . for permanent improvements or betterments made to increase the value of any property." "Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property," are generally required to be capitalized. Treas. Reg. § 1.162-4.

**[\*14]** Expenses incurred incident to an overall plan of rehabilitation must be capitalized even though the same expenses might be deductible if incurred separately. *See Norwest Corp. & Subs. v. Commissioner*, 108 T.C. 265, 280 (1997) (first citing *United States v. Wehrli*, 400 F.2d 686, 689 (10th Cir. 1968); then citing *Stoeltzing v. Commissioner*, 266 F.2d 374 (3d Cir. 1959), *aff'g* T.C. Memo. 1958-111; then citing *Jones v. Commissioner*, 242 F.2d 616 (5th Cir. 1957), *aff'g* 24 T.C. 563 (1955); and then citing *Cowell v. Commissioner*, 18 B.T.A. 997 (1930)). Whether an overall plan of capital improvement exists is a factual question, the resolution of which requires "a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done." *Wehrli*, 400 F.2d at 689–90; *see Norwest Corp.*, 108 T.C. at 285 (finding that costs of removing asbestos must be capitalized as part of a "full-blown general plan of rehabilitation"); *Bank of Houston v. Commissioner*, T.C. Memo. 1960-110, 19 T.C.M. (CCH) 589, 591–92 (finding that costs of renovating a 50-year-old building in "a general state of disrepair" must be capitalized). Although certain aspects of a rehabilitation project, viewed in isolation, might be considered repairs, the Code "does not envision the fragmentation of an over-all project for deduction or capitalization purposes." *Bank of Houston*, 19 T.C.M. (CCH) at 592.

During 1999 petitioners spent $451,949 on renovations to Stoneleigh. In his Posttrial Brief respondent contends that the following costs, representing 32% of the total, must be capitalized: $24,786 paid to Burr Fox Specialty Woodwork to replace cabinetry and woodwork; $22,878 paid to Elite Heating and Cooling for heating and air conditioning equipment and services; $60,232 paid to Inside Outlet for the installation of flooring, carpeting, and tiling; and $35,264 paid to Roy's Electric Service for electrical work.[5] During 2000 petitioners spent $558,185 on renovations to Stoneleigh. In his Posttrial Brief respondent contends $66,793 of these costs, representing 12% of the total, must be capitalized. That sum was paid to Nichols Construction Co. for waterproofing, resurfacing walls, carpeting, and other work done on the basement level, where law office employees other than Mr. Witasick worked.

At trial petitioners provided no documentary or testimonial evidence to establish the detailed nature of the work performed by these

---

[5] The total of the 1999 costs listed in the text, $143,160, exceeds by $280 the capital expenditures determined in the Notice ($142,880). Because respondent has not asserted an increased deficiency for 1999, we will treat $142,880 as the amount of 1999 capital expenditures in dispute.

[*15] five contractors. Petitioner husband admitted that Stoneleigh was in a state of disrepair when they purchased it, and he described the renovation as "a mammoth undertaking." But he said petitioners did not intend to change Stoneleigh, but simply to restore the mansion as closely as possible "to the way it looked when it was built." And he insisted that they made repairs only "as needs arose."

We did not find the latter testimony credible. Petitioners did not make episodic repairs to Stoneleigh "as needs arose." Rather, they embarked on a multi-year, million-dollar, rehabilitation plan that renovated every floor of the home. Renovations continued beyond the tax years at issue, including rehabilitation of the attic (originally unfinished) into an in-law suite. Assuming arguendo that petitioners' goal was to restore Stoneleigh "to the way it looked when it was built," that intent does not negate the existence of capital improvements.

The work performed by each contractor listed above—replacing cabinetry and woodwork, upgrading electrical service, installing HVAC equipment, installing flooring, waterproofing basement walls—surely has a "capital" flavor. The amounts paid to each contractor—ranging from $22,878 to $66,793—were substantial, far exceeding what homeowners typically pay for sporadic repairs. The scope of the rehabilitation and the need for extensive oversight by Ms. Booth indicate an overarching plan of rehabilitation. *See Stoeltzing v. Commissioner*, 266 F.2d at 376. Making "a realistic appraisal of all the surrounding facts and circumstances," including "the purpose, nature, extent, and value of the work done," we find that these expenditures were made pursuant to a "plan of capital improvement." *Wehrli*, 400 F.2d at 689–90; *Norwest Corp.*, 108 T.C. at 280.

Petitioners spent more than $1 million on renovations to Stoneleigh, and respondent urges that roughly 20% of those costs require capitalization. This seems a reasonable figure for an extensive multi-year renovation project, and petitioners have not carried their burden of proving the contrary. Some of the work performed by the five contractors—like painting walls—might be viewed as repairs if considered in isolation. But the Code "does not envision the fragmentation of an over-all project for deduction or capitalization purposes." *Bank of Houston*, 19 T.C.M. (CCH) at 591–92.

In sum, we conclude that the amounts paid to the five contractors were nondeductible capital expenditures because they brought about improvements "made to increase the value of any property" or

**[\*16]** "appreciably prolong the life of the property." *See* Treas. Reg. §§ 1.162-4, 1.263(a)-1(a)(1). We will accordingly sustain respondent's determination, as set forth in the Notice, that petitioners must capitalize $142,880 and $66,793 of renovation expenses for 1999 and 2000, respectively. And we sustain the allowance of depreciation deductions of $1,983 and $3,967, respectively.

### B.    *Business Use Percentage*

By Stipulation the parties have agreed to the treatment of all but $303,022 and $290,695 of expenses for 1999 and 2000, respectively. Of these amounts, we have held that $142,880 and $66,793, respectively, must be capitalized. Respondent agrees that the remainder of the renovation costs—$160,142 for 1999 and $223,902 for 2000—are deductible to the extent properly allocable to Mr. Witasick's satellite law office.

The parties disagree about the correct "business use of the home" percentage. Petitioners contend that 40% of Stoneleigh was devoted exclusively to Mr. Witasick's law practice each year. Respondent contends that the correct percentage is 25%. We agree with respondent, whose embrace of a 25% figure seems to us quite generous.

The Code generally prohibits deductions for expenses relating to a dwelling unit used by the taxpayer as a residence. *See* § 280A(a). Section 280A(c)(1)(A) provides an exception for "any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis . . . as the principal place of business for any trade or business of the taxpayer." *See Hamacher v. Commissioner*, 94 T.C. 348, 357 (1990) (stating that "exclusive use" is an "all-or-nothing standard").

A taxpayer can have only one principal place of business. *See Curphey v. Commissioner*, 73 T.C. 766, 776 (1980). That location is generally the "focal point" of the taxpayer's business activities. *Jackson v. Commissioner*, 76 T.C. 696, 700 (1981). If a taxpayer establishes that his residence constituted his "principal place of business," he must then prove what portion of the home was used *exclusively* for business purposes *on a regular basis*. Otherwise, we cannot determine the deductible portion of the expenses in question. *See Sam Goldberger, Inc. v. Commissioner*, 88 T.C. 1532, 1556–57 (1987).

Respondent agrees that Stoneleigh was Mr. Witasick's principal place of business during 1999 and 2000. We accordingly must decide what portion of Stoneleigh was devoted exclusively and on a regular

**[\*17]** basis to that business. This presents a question of fact. *See Feldman v. Commissioner*, 84 T.C. 1, 8 (1985), *aff'd*, 791 F.2d 781 (9th Cir. 1986).

In making a determination of this sort, we ordinarily consider the square footage or the number of rooms devoted exclusively to the business, as compared to the total square footage or number of rooms in the home. *See, e.g.*, *Luczaj & Assoc. v. Commissioner*, T.C. Memo. 2017-42, 113 T.C.M. (CCH) 1187, 1191; *Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 97 T.C.M. (CCH) 1090, 1097–98; *Swain v. Commissioner*, T.C. Memo. 1996-22, 71 T.C.M. (CCH) 1846, 1848, *aff'd without published opinion*, 96 F.3d 1439 (4th Cir. 1996). But we have rejected a room comparison approach when a "more precise" method was available. *See Feldman*, 84 T.C. at 8; *Rodriguez*, 97 T.C.M. (CCH) at 1098. The Commissioner advises taxpayers, not unreasonably, that the room comparison method may be used only "[i]f the rooms in your home are all about the same size." IRS Pub. 587, Business Use of Your Home 9 (2023).

During 1999 and 2000 Stoneleigh had 40 rooms that varied tremendously in size. As shown in the floorplan, some rooms were 4 to 6 times larger than others. On the other hand, the trial supplied ample evidence about the total square footage of the home—15,633 square feet, excluding the unfinished attic but including the basement—as well as the size of the rooms. Given these facts, we conclude that the square footage method must be used because it is more precise. *See Feldman*, 84 T.C. at 8 (adopting square footage method because it was "the more precise method and [thus] the most reasonable method available"); *Rodriguez*, 97 T.C.M. (CCH) at 1098 (same).

Three portions of Stoneleigh were arguably used for business purposes. The first was Mrs. Witasick's home office, where she allegedly performed tasks as the "director of office" for the law firm. But to avoid having his wife called as a witness at trial, Mr. Witasick stipulated that her home office is to be excluded in determining the business use percentage. *See supra* note 2. We will accordingly exclude it.[6]

Mr. Witasick used the first-floor library to discharge law-office tasks during 1999 and 2000. He contends that he used the library exclusively for this purpose, and we will accept his testimony on that point.

---

[6] In their Posttrial Brief petitioners insist that Mrs. Witasick's home office should be included in calculating the business use percentage. We will not permit them to withdraw their trial stipulation to the contrary, because doing so would unfairly prejudice respondent.

[*18] The library measured 321 square feet, or 2% of Stoneleigh's total square footage ($321 \div 15,633 = .0205$). This room thus carries a business use percentage of 2%.[7]

This brings us to the third relevant portion of Stoneleigh—the basement—where office employees other than Mr. Witasick worked. Petitioners contend that the basement was devoted 100% to business use during both years. And they assert that the basement generates a 33% business use percentage because it was one of three floors in the house.

We reject both contentions. First, the basement comprised 4,319 square feet, or only 27.6% of Stoneleigh's overall square footage. Because the square footage method must be used here, 27.6% would be the maximum percentage petitioners could extract from the basement.

Second, it is obvious that the entire basement was not used exclusively for business purposes, on a regular basis, during either 1999 or 2000. The basement had eight rooms. Several rooms—including the electrical room, the laundry, and the boiler room (which contained water heaters and HVAC equipment)—were clearly used (at least in part) to benefit Stoneleigh as a whole. And most of the rooms were unoccupied during much of the two-year period.

Petitioner husband did not open his satellite office at Stoneleigh until April 1999. The basement remained empty until June 1999, when Mr. Scott, a paralegal, joined the staff. He remained the only occupant of the basement until April 2000, when Kimberly Belognia, an attorney, and Susan Caviness, a secretary, joined the firm. Two months later all staff members vacated Stoneleigh because of renovations to the basement, returning in September 2000. Two new attorneys joined the firm in November 2000, but they occupied space in the basement for less than two months of the relevant period.[8]

---

[7] Petitioners assert that the library entitles them to a business use percentage of 7%. To support this number they theorize that the first floor is one of three floors in the house and that the library was one of five rooms on that floor ($33\% \times 20\% = 6.6\%$). We reject this argument: Because the library was tiny in comparison to the other rooms on the first floor, a room comparison method is unacceptably imprecise. *See Feldman*, 84 T.C. at 8. Besides, the first floor had 10 rooms, not 5. *See supra* p. 2.

[8] In their Posttrial Brief petitioners misrepresent the number of employees working from the basement during 1999 and 2000, pointing to a phone directory that listed 9 persons working at the Virginia office. That directory was created in June 2001, after all employees had been relocated from the basement of Stoneleigh to a law

**[*19]** In short, the basement was empty for the first half of 1999, and Mr. Scott was the only person working in the basement until April 2000. That being so, petitioners cannot plausibly contend that the entire basement, comprising 4,319 square feet, was used exclusively for business purposes on a regular basis during 1999 and 2000. They assert that the game room was used for client conferences and that other basement rooms were used to store law firm files. But most of the firm's clients were in Arizona or elsewhere, and the evidence established that onsite client conferences were rare. And we do not find it credible that eight separate rooms were used (or needed) to store files.

In allowing a business use percentage of 25%, respondent agrees that 3,908 square feet of Stoneleigh (15,633 ÷ 4) were used exclusively for business purposes in 1999 and 2000. Of that sum, 321 square feet were in Mr. Witasick's office; the remaining 3,587 square feet were necessarily in the basement, where all other employees worked. Respondent's 25% allocation thus concedes that 83% of the basement (3,587 ÷ 4,319) was used exclusively for law office purposes during each year. Given the facts recited above, this concession strikes us as extremely generous to petitioners.

During the criminal trial the prosecution estimated that the basement's business usage consisted of the game room (827 square feet), the foyer area (261 square feet), and the bathroom (75 square feet), for a total of 1,163 square feet. Respondent now concedes that *three times* as much basement space was used exclusively for Mr. Witasick's law office. If we were required to calculate a business use percentage for the basement from scratch—taking into account how few employees actually worked there—we would determine a much lower figure. But holding respondent to his concession, we find that the applicable "business use of the home" percentage is 25%. Petitioners have wholly failed to carry their burden of proving a percentage higher than that.

IV.  *Increased Deficiency*

In his Amended Answer respondent asserted an increased deficiency and a correspondingly increased fraud penalty for 2000. Underlying the increased deficiency are (1) correction of a clerical error in the Notice and (2) treating petitioners' allowable home office deduction, originally reported as "unreimbursed expenses" on Schedule E, as a

---

office in Martinsville. No record evidence supports petitioners' assertion that any employees, other than the five discussed in the text, worked in the basement during 1999 and 2000.

[*20] miscellaneous itemized deduction. Respondent bears the burden of proof as to the increased deficiency. *See* Rule 142(a).

In calculating the deficiency for 2000, the Notice assumed incorrectly that the "unreimbursed expenses" petitioners had reported on Schedule E were $242,391. In fact those expenses were $290,744, as shown on the 2000 return received in evidence at trial. The Notice thus determined an adjustment of $72,252, whereas the adjustment should have been $120,605. *See supra* p. 6.

When an increase in deficiency is premised on correction of a clerical or mathematical error in the notice of deficiency, the Commissioner bears only the burden of establishing the clerical or mathematical error. *See Estate of Applestein v. Commissioner*, 80 T.C. 331, 347 n.5 (1983); *Beck Chem. Equip. Corp. v. Commissioner*, 27 T.C. 840, 856 (1957); *Raquet v. Commissioner*, T.C. Memo. 1996-279, 71 T.C.M. (CCH) 3186, 3188; *Kiehl v. Commissioner*, T.C. Memo. 1986-54, 51 T.C.M. (CCH) 423, 425–26; *Holtz v. Commissioner*, T.C. Memo. 1982-436, 44 T.C.M. (CCH) 640, 644. Respondent established the clerical error by introducing into evidence a copy of petitioners' 2000 return, which showed that the unreimbursed expenses reported on Schedule E were $290,744, not $242,391 as erroneously stated in the Notice. Respondent was required to do no more than this to meet his burden of proof on that point.

Petitioner husband had no Schedule C business in 2000 because he practiced law in partnership with Mr. Parker. When a taxpayer has no Schedule C business, a home office deduction is normally reported as an unreimbursed employee business expense on Schedule A. *See, e.g.*, *Rodriguez v. Commissioner*, T.C. Memo. 2012-286, 104 T.C.M. (CCH) 425, 429; *Rosemann v. Commissioner*, T.C. Memo. 2009-185, 98 T.C.M. (CCH) 98, 102 (ruling that a deduction for unreimbursed business expenses is "included in the miscellaneous itemized deductions claimed on . . . Schedule A"). Instead, petitioners reported the home office deduction for 2000, allegedly totaling $290,744, on Schedule E as unreimbursed expenses of the partnership. By so doing, petitioners avoided the limitation imposed by section 67, which allows miscellaneous itemized deductions only to the extent they exceed 2% of AGI. *Cf. Leitch v. Commissioner*, T.C. Memo. 1993-154, 65 T.C.M. (CCH) 2362, 2364 (finding the taxpayer's reporting of unreimbursed employee business expenses on Schedule C was "solely designed to avoid the limitations of section 67").

**[\*21]** It is well settled that a partner may not deduct partnership expenses directly on his individual tax return. *Cropland Chem. Corp. v. Commissioner*, 75 T.C. 288, 295 (1980), *aff'd*, 665 F.2d 1050 (7th Cir. 1981) (unpublished table decision); *Wallendal v. Commissioner*, 31 T.C. 1249, 1252 (1959). An exception applies when there exists a written partnership agreement—or an established partnership practice tantamount to an agreement—that requires or authorizes a partner to pay partnership expenses out of his own pocket. *Cropland Chem. Corp.*, 75 T.C. at 295; *Wallendal*, 31 T.C. at 1252; *Klein v. Commissioner*, 25 T.C. 1045, 1051–52 (1956).

The parties have stipulated that Messrs. Witasick and Parker never executed a written partnership agreement. Mr. Parker did not testify at trial. Mr. Witasick did not testify that the partnership had an established practice governing reimbursement of partnership expenses incurred by a partner. And Mr. Witasick did not testify that Mr. Parker had agreed that petitioners' costs of renovating Stoneleigh should be treated as expenses of the partnership.

Because petitioners stipulated that there was no written partnership agreement, and because there is no evidence of a de facto agreement, Mr. Witasick's home office expenses for 2000 would be deductible only as unreimbursed employee expenses. Such expenses are treated as "miscellaneous itemized deductions" under section 67(b), and they are deductible under section 67(a) only to the extent they exceed the 2%-of-AGI limitation. Respondent has thus carried his burden of proving, by a preponderance of the evidence, that petitioners have an increased deficiency for 2000.

## V.    *Civil Fraud Penalty*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." The parties have stipulated that written supervisory approval of the fraud penalty was timely secured.

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment attributable to fraud. Respondent has the burden of proving fraud, and he must prove it by clear and convincing evidence. *See* § 7454(a); Rule 142(b). To sustain his burden, respondent must establish two elements: (1) that there was an underpayment of tax

**[\*22]** for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983).

Where the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420 (quoting *Temple v. Commissioner*, T.C. Memo. 2000-337, 80 T.C.M. (CCH) 611, 618, *aff'd*, 62 F. App'x 605 (6th Cir. 2003)). If the Commissioner proves that some portion of an underpayment for a particular year was attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance was not so attributable. § 6663(b).

For the reasons stated previously, respondent has carried his burden of proving by clear and convincing evidence that petitioners underreported their income and underpaid their tax for 1999 and 2000. On October 7, 2021, we granted respondent's Motion for Partial Summary Judgment regarding the existence of fraud for 1999 and 2000. Because Mr. Witasick was convicted of tax evasion for those years, he is collaterally estopped from denying that his underpayments for 1999 and 2000 were due to fraud. *See Anderson v. Commissioner*, 698 F.3d at 164–65; *DiLeo*, 96 T.C. at 885–86. Petitioners have failed to show by a preponderance of the evidence that any portion of either underpayment was not due to fraud. We thus sustain respondent's determination of fraud penalties against Mr. Witasick (but not his wife) for 1999 and 2000.

To reflect the foregoing,

*Decision will be entered under Rule 155.*